ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

_Romaine Hinds_____

_____

_____

*(Write the full name of each plaintiff who is filing
this complaint. If the names of all the plaintiffs
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)*

Amended

**Complaint for Violation of Civil
Rights**
(Non-Prisoner Complaint)

Case No. 1:16-cv-02977-PKC-LB
*(to be filled in by the Clerk's Office)*

Jury Trial:     X Yes     □ No
                *(check one)*

### -against-

CITY OF NEW YORK, Police Officer Villanueva,
Shield No. 5997, Police Officer O'Conner, Shield
No.1606, individually, and John Doe Officers 1-2,
individually,

_____

_____

_____

*(Write the full name of each defendant who is
being sued. If the names of all the defendants
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names. Do not include
addresses here.)*



RECEIVE D

JUL 2 2 2016

PRO SE OFFICE

## NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from
public access to electronic court files. Under this rule, papers filed with the court should *not*
contain: an individual's full social security number or full birth date; the full name of a person
known to be a minor; or a complete financial account number. A filing may include *only*: the
last four digits of a social security number; the year of an individual's birth; a minor's initials;
and the last four digits of a financial account number.

Plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other
materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an

## I.   The Parties to This Complaint

### A.   The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | _Romaine Hinds |
| Street Address | _11556 229th Street |
| City and County | _Cambria Heights, Queens |
| State and Zip Code | _New York 11411 |
| Telephone Number | _347-493-4356 |
| E-mail Address | _mr.romainehinds@gmail.com |

### B.   The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | __City of New York |
| Job or Title (if known) | __Office of Corporation Counsel |
| Street Address | _100 Church Street |
| City and County | _New York, NY |
| State and Zip Code | _New York 10007 |
| Telephone Number | _212-356-1000 |
| E-mail Address (if known) | |

Defendant No. 2

| | |
|---|---|
| Name | Officer Villanueva_____ |
| Job or Title (if known) | _____ |
| Street Address | _167-02 Baisley Blvd_____ |
| City and County | _Queens, Queens_____ |
| State and Zip Code | _New York 11434_____ |
| Telephone Number | _718-712-7733_____ |
| E-mail Address (if known) | _____ |

Defendant No. 3

| | |
|---|---|
| Name | Officer O'Conner_____ |
| Job or Title (if known) | _____ |
| Street Address | _167-02 Baisley Blvd_____ |
| City and County | _Queens, Queens_____ |
| State and Zip Code | _New York 11434_____ |
| Telephone Number | _718-712-7733_____ |
| E-mail Address (if known) | _____ |

Defendant No. 4

| | |
|---|---|
| Name | John Doe 1-2_____ |
| Job or Title (if known) | _____ |
| Street Address | _167-02 Baisley Blvd_____ |
| City and County | _Queens, Queens_____ |
| State and Zip Code | _New York 11434_____ |
| Telephone Number | _718-712-7733_____ |
| E-mail Address (if known) | _____ |

3

II.    **Basis for Jurisdiction**

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), you may sue federal officials for the violation of certain constitutional rights.

A.    Are you bringing suit against *(check all that apply)*:

    X    State or local officials (a § 1983 claim)

    ☐    Federal officials (a *Bivens* claim)

B.    Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

    This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, title 18, U.S.C, section 241, 242, title 42, U.S.C, section 14141 and the Fourth and Fourteenth Amendments to the Constitution of the United States.

C.    Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

D.    Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

    _See attached_____

### III.   Statement of Claim

State as briefly as possible the facts of your case.  Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events.  You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite any cases or statutes.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.   Where did the events giving rise to your claim(s) occur?

_The corner of Williamson ave and 197th Street St. Albans NY Queens County_____

_____

_____

B.   What date and approximate time did the events giving rise to your claim(s) occur?

_At or around 5pm August 8th 2014_____

_____

_____

C.   What are the facts underlying your claim(s)? *(For example:  What happened to you?  Who did what?  Was anyone else involved?  Who else saw what happened?)*

_See attached_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**IV.**     **Injuries**

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

_See attached

**V.**     **Relief**

State briefly what you want the court to do for you.   Make no legal arguments. Do not cite any cases or statutes.  If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

_See attached

**VI.**     **Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

6

A.      **For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: July 21, 2016.

Signature of Plaintiff    *Rhinds*

Printed Name of Plaintiff    Romaine Hinds

Submitted
July 22, 2016.                    7

1.                    **STATEMENT OF FACTS**

2. On or around August 8, 2014, Mr. Hinds called 911 requesting police

   assistance with a break in at or around the corner of Williamson Ave and 197th

   Street in Queens County, St. Albans.

3. After approximately one hour, Officer Villanueva Defendant and Officer

   O'Conner Defendant arrived. Mr. Hinds introduced himself to Officer

   Villanueva Defendant as the owner of this vehicle and was instantly told to

   shut up by Officer Villanueva Defendant. Mr. Hinds was shocked by Officer

   Villanueva Defendant response and Mr. Hinds attempted to explain to Officer

   Villanueva that Mr. Hinds was the one who requested police assistance. Mr.

   Hinds states Officer Villanueva demeanor was as if he was irritated and

   postured himself aggressively.

4. Upon noticing this Mr. Hinds felt unsafe so Mr. Hinds took his smart phone out

   and began recording. Mr. Hinds then continued to attempt to explain to Officer

   Villanueva Defendant what was going on. Mr. Hinds explained to Officer

   Villanueva Defendant that someone broke into his vehicle and stole his audio

   equipment.

5. Officer Villanueva Defendant looked at O'Conner Defendant and Villanueva Defendant response was "Bullshit, no one is that nice to smash your window and place a trash bag over it. I think you did this yourself."2

6. Mr. Hinds responded, "why, would I smash my own window just to wait an hour and a half to be harassed by two Police Officers. I just want a police report done so that I can file my insurance claim." Officer Villanueva Defendant, then responded with a more aggressive and accusatory tone. Officer Villanueva Defendant, then demanded Mr. Hinds Identification and vehicle registration which Mr. Hinds provided to him.

7. Mr. Hinds asked him if he can just take a police report. Mr. Hinds didn't want any trouble Mr. Hinds just need it to file his insurance. Officer Villanueva Defendant, ignored Mr. Hinds and walked back to his Police van. Mr. Hinds followed both Officer Villanueva and Officer O'Conner and continued to record. Mr. Hinds cannot recall exactly but there was further exchange between Officer Villanueva and Mr. Hinds as Mr. Hinds continued to ask if a police report will be taken.

8. Officer Villanueva Defendant, then threaten to arrest Mr. Hinds and at that moment Mr. Hinds feared for his freedom and called 911 again. The same female dispatcher answered and Mr. Hinds explained to her what was going on. Mr. Hinds then requested if a sergeant, Doe Defendant, could come out to assist because these Officers, Villanueva and O'Conner Defendants, are treating Mr. Hinds as if he was a criminal. She advised Mr. Hinds that a sergeant, Doe Defendant, will be at Mr. Hinds's location shortly.

9. At this time Officers Villanueva and O'Conner Defendants, remained in there Police van while Mr. Hinds continued to record a safe distance away. Maybe 20 minutes later a 2013 Ford Fusion Police car pulled up to the driver side of Officer Villanueva's Police van and began speaking to Officer O'Conner who was in the driver's seat. In the car was two Officers Doe Defendants. This lasted maybe 5 to 10 minutes and at this time nothing was said to Mr. Hinds.

10. The 2013 Ford Fusion Police car then drove off and approximately 2 minutes later Officer Villanueva got out of the police van and handed Mr. Hinds back his ID and registration. Mr. Hinds asked Officer Villanueva again if a police report would be taken and Officer Villanueva didn't respond. Officer Villanueva when back to his van and sat there for about 5 more minutes until

Mr. Hinds's phone alerted him to a call to which Mr. Hinds stopped recording at that moment the Police van was started and both Officers Villanueva and O'Conner drove off.

11. However, Mr. Hinds was able to catch Officers Villanueva and O'Conner Defendants, driving off on camera. Standing there confused Mr. Hinds called 911 again and the same female dispatcher picked up again. Mr. Hinds explained to her what was going on and she gave Mr. Hinds the number to internal affairs as well as transferring him over to them.

12. While on hold the Police van pulled back up but this time parking further ahead of Mr. Hinds's vehicle. Officer Villanueva then got out the car and went to speak with an "unidentified" older female who lived in the house closes to where Mr. Hinds's vehicle was parked.

13. Officer Villanueva then approached Mr. Hinds and told Mr. Hinds that he was towing his vehicle. Mr. Hinds asked Officer Villanueva for what at that moment  Officer Villanueva began to verbally assault Mr. Hinds. Mr. Hinds vividly remember's Officer Villanueva stating that Mr. Hinds was a

"unproductive existence in the community that I'm only good for gang banging and going to jail".

14. Horrified by the statement made by Officer Villanueva, Mr. Hinds, again began to record catching the rest of Officer Villanueva's rant. Mr. Hinds stepped away from Officer Villanueva because it was obvious Officer Villanueva had no intention of showing Mr. Hinds any respect or respect Mr. Hinds's rights not to be discriminated on.

15. At this time Mr. Hinds when to Officer O'Conner Defendant, to ask why his vehicle was being towed and why a police report wasn't being taken and why there are doing this to him. Mr. Hinds wanted to know what he did to deserve this treatment. Again, Mr. Hinds got no response. Officer O'Conner Defendant placed a sticker on Mr. Hinds vehicle and had it towed away.

16. Mr. Hinds went to the 113th precinct at the advice of the internal affairs officer he was speaking to. Upon identifying himself and asking for assistance Mr. Hinds was completely ignored by the guy at the front desk. Officer Villanueva Defendant, who was in plain sight also ignored Mr. Hinds. When Mr. Hinds asked why was his car towed and why he wasn't given a police report, ticket or

anything. Again, Mr. Hinds got no response. At this point the Internal Affairs

Agent told Mr. Hinds to leave the precinct and that he ("Internal Affairs

Agent") will contact Mr. Hinds when he ("Internal Affairs Agent") finds out

what's going on.

17. Mr. Hinds never heard back from the Internal Affairs Agent or the Defendants

Officer Villanueva and Officer O'Conner.

18. Mr. Hinds went on the file a notice of claim with the City of New York

Defendant, and 3-4 days after the hearing and five months after the incident.

Mr. Hinds finally received a letter from the City of New York Defendant,

stating the location to which Mr. Hinds's vehicle was being stored. The City of

New York Defendant provided no explanation as to why Mr. Hinds's vehicle

was towed.

19. Mr. Hinds suffered damage as a result of Defendants' actions. Defendants

unconstitutionally deprived Mr. Hinds of his liberty, property, invaded his

privacy, damaged his reputations, caused Mr. Hinds emotional distress and fear

that manifested in physical ailments and more.

20. Mr. Hinds suffered physical injury as a result of Defendants' actions, Mr. Hinds was randomly physically assaulted while attempting to take public transportation which resulted in Mr. Hinds breaking his arm. A position Mr. Hinds would not have been in if Mr. Hinds had the Defendants' not deprived Mr. Hinds of his property.

21. The amount of pain and suffering that this caused Mr. Hinds is unimaginable. Mr. Hinds was unable to go and see his child under his own means. Because Mr. Hinds no longer had his vehicle it became hard for Mr. Hinds to make it to work on time. Given the distance from Mr. Hinds's home and work. It made it difficult for Mr. Hinds to get to his classes on time severely impacting Mr. Hinds's grades.

22. All of the above occurred as a direct result of the unconstitutional policies, customs or practices of the City of New York, including, without limitation, the inadequate screening, hiring, retaining, training and supervising of its employees, and due to a custom, policy and/or practice of: arresting innocent persons in order to meet "productivity goals," or arrest quotas; arresting individuals for professional advancement, overtime compensation, and/or other objectives outside the ends of justice; and/or manufacturing false evidence

against individuals in an individual effort and also in a conspiracy to justify

their abuse of authority in falsely arresting, unlawfully stopping and

maliciously prosecuting those individuals.

23. The aforesaid incident is not an isolated incident. The existence of the

aforesaid unconstitutional customs and policies may be inferred from repeated

occurrences of similar wrongful conduct as documented in civil rights actions

filed in the United States District Courts in the Eastern and Southern Districts

of New York as well as in New York State courts. As a result, Defendant City

of New York is aware (from said lawsuits as well as notices of claims and

complaints filed with the NYPD's Internal Affairs Bureau and the CCRB) that

many NYPD officers, including the Defendants, arrest individual persons in

order to meet productivity goals and arrest quotas; arrest individuals for

professional advancement, overtime compensation and/or other objectives

outside the ends of justice; and/or falsely arrest individuals and engage in a

practice of falsification of evidence in an attempt to justify the false arrest.

24. Additional allegations relating to these unconstitutional policies, customs and

practices and the failure to adequately screen, hire, retain, train and supervise

are set forth in the section corresponding to Plaintiffs' Monell claim, below.

25. Defendant City of New York is aware that its improper training and customs and policies have often resulted in a deprivation of individuals' constitutional rights. Despite such notice, Defendant City of New York has failed to take corrective action. This failure caused Individual Defendants in this case to violate Plaintiffs' constitutional rights.

26. Moreover, on information and belief, Defendant City of New York was aware, prior to the incident, that the Individual Defendants lacked the objectivity, temperament, maturity, discretion and disposition to be employed as police officers. Despite such notice, Defendant City of New York has retained these officers, and failed to adequately train and supervise them.

27. All of the aforementioned acts of Defendants, their agents, servants and employees were carried out under color of state law.

28. All of the aforementioned acts deprived Plaintiffs of the rights, privileges and immunities guaranteed to citizens of the United States by the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and in violation of 42 U.S.C. § 1983.

29. The acts complained of were carried out by the aforementioned Individual Defendants in their capacities as police officers, with the entire actual and/or

apparent authority attendant thereto, pursuant to the customs, usages, practices, procedures and the rules of the Defendant City of New York and the NYPD, all under the supervision of ranking officers of said department.

30. Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

31. As a result of the foregoing, Mr. Hinds is entitled to compensatory and punitive damages in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## FIRST CLAIM

## 42 U.S.C Section 1983

32. Mr. Hinds repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

33. Defendants, by their conduct toward Mr. Hinds alleged herein, violated Mr. Hinds's rights guaranteed by 42 U.S.C. § 1983, the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States.

34. Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Mr. Hinds of his constitutional rights.

35. As a direct and proximate result of Defendants' unlawful conduct, Mr. Hinds sustained the damages hereinbefore alleged.

## SECOND CLAIM

## UNREASONABLE SEARCH & SEIZURE, EXCESSIVE FORCE

36. Mr. Hinds repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

37. Defendants violated the Fourth and Fourteenth Amendments because they unreasonably searched and/or seized Mr. Hinds and/or the vehicle.

38. Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Mr. Hinds of his constitutional rights.

39. As a direct and proximate result of Defendants' unlawful conduct, Mr. Hinds sustained the damages hereinbefore alleged.

## THIRD CLAIM

### FAILURE TO INTERVENE

40. Mr. Hinds repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

41. Individual Defendants actively participated in the aforementioned unlawful conduct but also observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

42. Accordingly, Individual Defendants who failed to intervene violated the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

43. Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Mr. Hinds of his constitutional rights.

44. As a direct and proximate result of Defendants' unlawful conduct, Mr. Hinds sustained the damages hereinbefore alleged.

## FOUTH CLAIM

## MONELL CLAIM

45. Mr. Hinds repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

46. The foregoing injuries and violations of Mr. Hinds's federal constitutional rights were directly, foreseeably, proximately, and substantially caused by conduct chargeable to the Defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, who are allegedly investigated, arrested, or prosecuted for alleged criminal activities.

47. The City is liable for the aforementioned injuries and violations because the City has failed to right the wrong in this case but, more importantly, it has created policies or customs which have created conditions and which perpetuate conditions under which unconstitutional practices regularly occur and even thrive; and has been indifferent, reckless and negligent in managing subordinates who cause the unlawful events. The result of the City's inaction is a culture within the NYPD where the same officers, the same units, and the same precincts repeatedly and routinely engage in acts of misconduct.

48. The acts complained of were carried out by the Defendants in their capacities as police officers and officials pursuant to policies, procedures, regulations, practices, and customs implemented by the City and NYPD, and all under the supervision of ranking officers of the NYPD.

49. Policymaking officials of the City and NYPD implemented plainly inadequate policies, procedures, regulations, practices, and customs, including but not limited to the following: 1) arresting persons known to be innocent in order to meet "productivity goals"; 2) falsely swearing out criminal complaints and/or lying and committing perjury during sworn testimony to protect other officers and meet "productivity goals"; 3) failing to supervise, train, instruct and discipline police officers thereby encouraging their misconduct and exhibiting deliberate indifference towards the constitutional rights of persons within the officers' jurisdiction; 4) discouraging police officers from reporting the corrupt or unlawful acts of other officers; 5) retaliating against officers who report police misconduct; and 6) failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented with proper supervision. By failing to properly train, supervise and discipline its

employees, agents, and servants, the City effectively encourages illegal,

immoral, and unprofessional behavior.

50.  At the time of the aforementioned constitutional violations, the City and

NYPD had long been on notice of such unconstitutional conduct, customs, and

de facto policies, such that the failure of the City and NYPD to take

appropriate remedial action amounted to deliberate indifference to the

constitutional rights of persons with whom the police come in contact. In light

of the extensive pattern of well-settled, pervasive customs and policies causing

constitutional violations, documented in part, infra, the need for more effective

supervision and other remedial measures was patently obvious, but the City

and NYPD made no meaningful attempt to prevent future constitutional

violations.

51.  The City is on clear notice that its policies and customs have caused and

continue to cause chronic constitutional violations. This notice is evidenced by

(1) the number of Civil Rights Lawsuits filed against it and its law enforcement

officers (which, on information and belief, the City does not adequately track

in order to identify problem precincts and/or problem officers), (2) the number

of Notices of Claim ("NOC") filed against the City and its law enforcement

officers and the City's inadequate responses to those NOCs, (3) the number of

Complaints filed with the Civil Complaint Review Board ("CCRB") against

the City's law enforcement officers, (4) City Council hearings, (5) newspaper

reports, (6) criminal cases resulting in declined prosecutions and dismissals,

and (7) judicial rulings suppressing evidence and finding officers incredible as

a matter of law. Taken together, all of these red flags demonstrate that a

troubling number of NYPD officers unlawfully search and seize New Yorkers

without probable cause, bring charges against New Yorkers with no legal basis,

perjure themselves in charging instruments and through testimony, use

excessive force against individuals, and fail to intervene in and report the

obviously illegal actions of their fellow officers, inter alia.

52.   For decades, the City has been on notice that certain precincts and certain

police officers are disproportionately responsible for civil rights lawsuit

liability. Nonetheless, the City has failed to take action to track such

information in order to hold precincts or officers accountable. See, e.g., Wyatt

v. Cole, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 lawsuits is to deter

state actors from using the badge of their authority to deprive individuals of

their federally guaranteed rights and to provide relief to victims if such

deterrence fails.").

53. One of the more recent examples of the City failing to make use of Civil

Rights Lawsuit data to improve law enforcement's record vis-à-vis the

protection of individuals' rights occurred in 2014 when the City Council

considered whether the NYPD should have to produce quarterly reports about

complaints against the department. Among other things, the reports would

indicate whether an officer who was the subject of a complaint had "previously

been the subject of a civil action or actions alleging police misconduct" so that

tailored attention could be given to an open and obvious existing and/or

developing problem. See Azi Paybarah, Council Seeks Regular Reports On

NYPD Complaints, May 5, 2014, at http://www.capitalnewyork.com/article/

city-hall/2014/05/8544832/council-seeks-regular-reports-nypd-complaints (last

accessed May 21, 2016).

54. NYPD Commissioner Bill Bratton publicly opposed these reporting

requirements. In June 2015, Commissioner Bratton stated that "[r]ather than

enacting a set of reporting bills that impose information-sharing as a mandate,

[the NYPD and the City Council] should sit down together and work out how

relevant information may be shared, taking into account the manner in which the information is collected and maintained—and our available resources." See New York Police Department Commissioner William Bratton, Statement Before The New York City Council Public Safety Committee, June 30, 2015, at http://nypdnews.com/2015/06/police-commissioner-brattons-statement-before-the-new-york-city-council-public-safety-committee/.

55.  The City's failure to compile and employ Civil Rights Lawsuit data in this manner is particularly shocking when one considers the trove of data that this represents. For example, between 2009 and 2014, the City paid an average of $33,875 per case to resolve well over 10,000 cases. See Caroline Bankoff, The City Has Paid Almost Half a Billion Dollars in NYPD-Related Settlements Over the Past 5 Years, Oct. 12, 2014, available at: http://nymag.com/daily/intelligencer/2014/10/428-million-in-nypd-related-settlements-paid.html. Similarly, the City Comptroller has reported that the City of New York's payments to resolve allegations of misconduct by members of the NYPD has risen from $99 million to $217 million in between 2005 and 2014. While such numbers relate to the NYPD as a whole, they reflect that the City had actual knowledge that its police department was routinely engaging in

unconstitutional and unlawful conduct. See Office of the Comptroller, Claims

Report: Fiscal Years 2013 and 2014, available at http://nylawyer.nylj.com/

adgifs/decisions15/083115claims.pdf.

56. The City's opposition to or refusal to consider adopting more robust data

collection, analysis and reporting practices, despite knowing those practices'

benefits, has been longstanding.

57. In 1999, Comptroller Alan Hevesi, in a memo to Police Commissioner

Howard Safir, stated that there was a "total disconnect" between the settlement

of civil claims—even substantial ones—and NYPD discipline of officers.

Hevesi continued that, as a result of this disconnect, the NYPD does not learn

of potential problem officers and precincts, fails to take curative action, and not

infrequently fosters a situation in which an officer will engage in another act of

violation, resulting in harm to another person and further damages from the

City.

58. By failing to keep track of crucial data, which could save lives as well as

taxpayer money, the City has created a system in which lawsuits are treated as

unrelated to their potential deterrent effect.

59.  The City is also on notice that it employs policies and practices which are

presently insufficient to identify law enforcement's chronic violations of

individuals' civil rights because recent Civil Rights Lawsuits and Criminal

Prosecutions amply document systemic problems which the NYPD resists

addressing, as evidenced by its opposition to reporting protocols and officer

recidivism analyses. By way of example,

    A.   In People v. William Eiseman, Index No. 2999-2010 (N.Y.

Sup. Ct., New York County), NYPD Sergeant William

Eiseman pled guilty to perjury and falsifying police records,

admitting to faking a marijuana case against one man and

cocaine-related charges against another – and training

subordinate officers to falsify paperwork to sidestep legal

safeguards. See, e.g., NYPD Sgt. William Eiseman Pleads

Guilty To Lying Under Oath In Plea Deal, New York Daily

News, June 27, 2011, at http://www.nydailynews.com/news/

crime/nypd-sgt-william-eiseman-pleads-guilty-lying-oath-

plea-deal-article-1.129288.

B.   In or around 2007, the United States Attorney's Office investigated the 109th precinct of the NYPD for "planting drugs on suspects and stealing cash during gambling raids." The 109th precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to the arrest. According to the Assistant United States Attorney Monica Evans, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose." John Marzulli, Claims of Corruption in Kings Precinct Put Crooked Cop's Sentencing on Hold, N.Y. Daily News, June 20, 2008, available at http:// www.nydailynews.com/news/ crime/claims-corruption-Kings-precinct-put-crooked-sentencing-hold-article-1.296352.

C.   In White-Ruiz v. City of New York, 983 F. Supp. 365, 380 (S.D.N.Y. 1997), the Court stated that it found the Mollen Commission's July 7, 1994 report investigating "Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department" to be "entirely reliable." Among other

things, the Mollen Commision reported that NYPD "[o]fficers

who report misconduct are ostracized and harassed; become

targets of complaints and even physical threats; and are made

to fear that they will be left alone on the streets in a time of

crisis. This draconian enforcement of the code of silence fuels

corruption because it makes corrupt cops feel protected an

invulnerable."

60. These cases are but a small drop in the ocean of Civil Rights Cases and

Criminal Prosecutions which tend to reveal that the NYPD has been shown

over and over to have a culture of unconstitutional customs and practices,

specifically with regard to the a culture of officers lying under oath, falsely

swearing out criminal complaints or otherwise falsifying or fabricating

evidence, and covering for one's colleagues when they engage in this

misconduct, results in individuals suffering false arrest, false imprisonment,

malicious prosecution, and other constitutional torts.

61. It is thus manifestly clear through the litigation brought in federal and state

courts in the City that even if the City was not the deliberate, malicious

architect of polices and routinized conduct causing chronic violations of individuals' constitutional rights, it was certainly on notice of the practice. By failing to take any meaningful corrective steps and instead choosing to put out fires whenever they break out (which is often), the City has ratified, endorsed, and otherwise communicated its acceptance of these policies and customs to the officers it employs.

62. In addition, members of the NYPD are evaluated, at least in part, on the basis of their "productivity," which is measured by the number of arrests made, search warrants secured, and other, similar criteria. Thus, members of the NYPD routinely make arrests and engage in other police activity without legal cause in order to raise their levels of "productivity" and improve the perception of their job performance.

63. Under this policy or plan, officers are encouraged and pressured to make as many arrests as possible, which has caused and will continue to cause its officers, including the individual Defendants and their colleagues, to make arrests regardless of whether there was any factual basis for the charges. Accordingly, officers would have strong incentives to fabricate claims that the persons being arrested were engaging in criminal activity. Certain examples of

this were already discussed above in the context of, for example, flaking

(planting narcotics on an individual in order to arrest).

64. The City is liable to Plaintiff for its failure to keep track of judicial decisions
in suppression hearings. Suppression hearings are a common context in which
police officers' reveal themselves to have fabricated testimony, and this
provides a ripe opportunity for the collection of data that would permit the City
to target problem officers and precincts for discipline and training.

65. There are hundreds of published decisions from the past several years in
which judges in New York City courtrooms determine that, as a matter of law,
police officers have testified incredibly, conducted illegal searches and
seizures, and even suborned perjury.

66. Judicial decisions from suppression hearings and trials are particularly reliable
indicators of a police officer's professional conduct and credibility because the
testimony has been tested in open court, under oath.

67. Yet those in a position of authority—such as City policymakers, NYPD
supervisors and prosecutors—have devised no procedure by which an adverse
judicial finding as to an individual officer's testimony is communicated to that
officer, his/her supervisor, or an oversight body.

68. Without any notification, improper search and seizure practices and incredible testimony go uncorrected, problematic supervision or leadership at the precinct level goes ignored, and repeated misconduct by individual officers goes unaccounted for.

69. This has created a climate where police officers and detectives lie to prosecutors and in police paperwork and charging instruments, and testify falsely, with no fear of reprisal.

70. The City is liable because it has created a legal system in which officer misconduct routinely goes unpunished. The City has purported to attempt to address police officers' abuse of authority, in part through the creation and operation of the CCRB, a police oversight agency with investigative powers.

71. The actions of Defendants, resulting from and taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of the City, are implemented by members of the NYPD engaging in systematic and ubiquitous perjury, both oral and written, to cover up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and the NYPD Commissioner who

all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the IAB, and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testifying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves, fellow office supervisors and/or subordinates against those civilians.

72. All of the foregoing acts by defendants deprived Mr. Hinds of his federally protected rights, including, but limited to, the constitutional rights enumerated herein.

73. Defendant City knew or should have known that the acts alleged herein would deprive Plaintiff of his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

74. Defendant City is directly liable and responsible for the acts of Defendants, as it repeatedly and knowingly failed to properly supervise, train, instruct, and

discipline them and because it repeatedly and knowingly failed to enforce the

rules and regulations of the City and NYPD, and to require compliance with

the Constitution and laws of the United States.

75.   Despite knowledge of such unlawful de facto policies, practices, and/or

customs, these supervisory and policy-making officers and officials of the

NYPD and the City, including the NYPD Commissioner, have not taken steps

to terminate these policies, practices and/or customs, do not discipline

individuals who engage in such polices, practices and/or customs, or otherwise

properly train police officers with regard to the constitutional and statutory

limits on the exercise of their authority, and instead approve and ratify these

policies, practices and/or customs through their active encouragement of,

deliberate indifference to and/or reckless disregard of the effects of said

policies, practices and/or customs or the constitutional rights of persons in the

City of New York.

76.   The aforementioned City policies, practices and/or customs of failing to

supervise, train, instruct and discipline police officers and encouraging their

misconduct are evidenced by the police misconduct detailed herein.

Specifically, pursuant to the aforementioned City policies, practices and/or

customs, Defendants felt empowered to arrest Plaintiff without probable cause and then fabricate and swear to a false story to cover up their blatant violations of Plaintiff's constitutional rights. Pursuant to the aforementioned City policies, practices and/or customs, the officers failed to intervene in or report Defendants' violations of Mr. Hinds's rights.

77. Mr. Hinds's injuries were a direct and proximate result of the Defendant City and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the Defendant City and the NYPD to properly supervise, train and discipline their police officers.

78. As a result of the foregoing, Mr. Hinds was deprived of his liberty, endured psychological and emotional injury, humiliation, costs and expenses and suffered other damages and injuries.

79. Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

80. The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City of New York and the NYPD included, but were not limited to, the inadequate screening, hiring, retaining, training and supervising of its employees that was the moving force behind the violation of Plaintiffs' rights as described herein. As a result of the failure of the Defendant City of New York to properly recruit, screen, train, discipline and supervise its officers, including the Individual Defendants, Defendant City of New York has tacitly authorized, ratified and has been deliberately indifferent to, the acts and conduct complained of herein.

81. The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City of New York and the NYPD included, but were not limited to: arresting innocent persons in order to meet "productivity goals," or arrest quotas; arresting individuals for professional advancement, overtime compensation, and/or other objectives outside the ends of justice; and/or manufacturing false evidence against individuals in an individual effort and also in a conspiracy to justify their abuse of authority in falsely arresting, unlawfully stopping and maliciously prosecuting those individuals.

82. The foregoing customs, policies, usages, practices, procedures and rules of the Defendant City of New York and the NYPD constituted deliberate indifference to the safety, well-being and constitutional rights of Mr. Hinds.

83. The foregoing customs, polices, usages, practices, procedures and rules of Defendant City of New York and the NYPD were the direct and proximate cause of the constitutional violations suffered by Mr. Hinds as described herein. **PRAYER FOR RELIEF WHEREFORE**, Mr. Hinds respectfully request the following relief:

1. An order entering judgment for Mr. Hinds against Defendants on each of their claims for relief;

2. Awards to Mr. Hinds for compensatory damages against all Defendants, jointly and severally, for their violation of the Fourth, Fifth, Sixth and Fourteenth Amendment rights of Mr. Hinds, the amount to be determined at jury trial, which Mr. Hinds respectfully demand pursuant to FRCP 38;

3. Awards to Mr. Hinds of punitive damages against Defendants on the basis of their conscious wrongdoing and callous indifference to the constitutional rights and welfare of Mr. Hinds, whatever amount in excess of $5,000,000, exclusive of the costs and interest, that Plaintiff is found to be entitled the

amount to be determined at jury trial, which Mr. Hinds respectfully demand

pursuant to FRCP 38;

4. Awards to Mr. Hinds of the costs of this action, including reasonable

attorneys' fees;

5. Such further relief as this Court deems just and proper.